UNITED STATES  DISTRICT COURT

Northern District of California

San Francisco Division

RICHARD PAUL KARR,

               Plaintiff,

    v.

JANET NAPOLITANO, Secretary of the
Department of Homeland Security

               Defendant.

_____/

No. C 11-02207 LB

**ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY
JUDGMENT**

[Re: ECF No. 46]

## I.  INTRODUCTION

    Plaintiff Richard Karr, a United States Customs and Border Protection ("CBP") officer, sued his

employer, Janet Napolitano ("Defendant"), Secretary of the Department of Homeland Security

("DHS"), after he was demoted and suspended following an investigation concerning his request to a

subordinate employee to improperly access a computer database.  Complaint, ECF No. 1 at 7-10, ¶¶

36-50.[1]  Mr. Karr alleges that his removal was discriminatory and retaliatory in violation of the

Rehabilitation Act of 1973, 29 U.S.C. § 791, as amended by the Americans with Disabilities Act of

1990 ("ADA"), 12 U.S.C. § 12101, *et seq*., and the Americans with Disability Act Amendments Act

---

    [1]  Citations are to the clerk's electronic case file (ECF) with pin cites to the electronic page
numbers at the top (as opposed to the bottom) of the page.

C 11-02207 LB
ORDER

UNITED STATES DISTRICT COURT
For the Northern District of California

1  of 2008 ("ADAAA"), P.L. 110-325 (Claims One and Two). *Id.* at 10-13, ¶¶ 51-83.[2]  Upon review of

2  the papers submitted and the arguments of counsel at the September 20, 2012 hearing, the court

3  **GRANTS** Defendant's motion for summary judgment.

## II.  BACKGROUND[3]

**A.  <u>Mr. Karr's Previous Positions and Prior Suspensions</u>**

6  Mr. Karr began working for the Immigration and Naturalization Service ("INS") as an

7  Immigration Inspector in 1988 and became a Supervisory Immigration Inspector in 1995.  Joint

8  Statement of Undisputed Facts ("JSUF") 1.[4]  On March 1, 2003, Mr. Karr moved from INS to CBP,

9  an agency within the DHS, where he held a similar position that is now called a Supervisory

10  Customs and Border Protection Officer ("SCBPO").  JSUF 2.

11  Mr. Karr served three suspensions from 2004 to 2009:

12  • On May 5, 2004, Mr. Karr received a three-day suspension for (1) failing to follow instructions

13    directing him not to go outside the chain of command and independently contact representatives

14    of foreign governments; and (2) granting a waiver allowing a foreign national to enter the

15    country without obtaining authorization from his chain of command.  JSUF 3.

---

17  [2] Mr. Karr also alleged that his removal was retaliatory and constituted an adverse
18  employment action in violation of the Civil Service Reform Act of 1978 ("CSRA"), 5 U.S.C. §
    1201, *et seq*., as amended by the Whistleblower Protection Act, 5 U.S.C. § 2302 (Claim Three).
19  Complaint, ECF No. 1 at 13-14, ¶¶ 84-97.  These claims were reviewed initially by the
    Merit Systems Protection Board ("MSPB"), which upheld Mr. Karr's demotion and suspension. *Id.*
20  at 3, ¶ 6.  On March 7, 2012, the court granted Defendant's motion for summary judgment on
    these non-discrimination claims because there are no issues of material fact that would call into
21  question whether (A) the MSPB's decision was arbitrary, capricious, an abuse of discretion, or
    otherwise not in accordance with law, (B) obtained without procedures required by law, rule, or
22  regulation having been followed, or (C) unsupported by substantial evidence.  3/7/2012 Order,
    ECF No. 33.
23

24
25  [3] Mr. Karr objected to many of the parties' undisputed facts.  Objection, ECF No. 53.
    Specifically, Mr. Karr objected, on various grounds, to Defendant's use of JSUF 69-77, 80-85, and
26  104 in its motion for summary judgment.  *Id.*  But because the court does not need to consider these
    undisputed facts for purposes of this order, the court deems Mr. Karr's objections to them to be
27  moot.

28  [4] The parties' Joint Statement of Undisputed Facts is found at ECF No. 48.

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

- On October 26, 2006, Mr. Karr received a ten-day suspension for again failing to follow instructions directing him not to go outside the chain of command and independently contact foreign government officials.  JSUF 4.
- On June 10, 2009, Mr. Karr received a 21-day suspension for once again failing to follow instructions directing him not to go outside the chain of command and independently contact foreign government officials.  JSUF 5.

**B.  The January 8, 2009 Incident and Mr. Karr's Subsequent Suspension and Demotion**

On January 8, 2009, Mr. Karr, then a GS-12 SCBPO in San Francisco, California, telephoned a CBP passenger targeting unit, identified himself by name and title, and asked a lower-ranked officer to perform an improper database search to see if his wife, who is a flight attendant, was onboard a particular flight.  JSUF 6.  Mr. Karr did this for his own personal convenience.  JSUF 7; *see* MSPB0446 ("I knew I had to coordinate transportation logistics to pick her up at the airport.").  The officer refused to perform this improper search and notified her chain of command, which in turn notified Internal Affairs.  JSUF 8.

The CBP conducted an investigation into the incident.  MSPB0441-0481.  During that time, Mr. Karr temporarily was reassigned from the San Francisco International Airport Air Mail Facility to the Drawback Unit at the San Francisco Customhouse, his firearm was removed, and his access to system databases was limited.  JSUF 10.  These steps are routine in cases involving such misconduct.  *See* MSPB0780.  Mr. Karr continued to receive his GS-12 salary, but he was not permitted to work overtime due to the firearm removal and loss of system access.  MSPB0281; MSPB0795; Plaintiff's Deposition ("Pl. Dep.") at 59:18-60:22.[5]

The CBP's Discipline Review Board ("DRB") convened and considered Mr. Karr's case.  JSUF 11.  On October 19, 2009, the DRB proposed that Mr. Karr be suspended from duty and pay for 45 days and be demoted from the position of GS-12 supervisory CBP officer to the position of GS-11 journeyman CBP officer.  JSUF 12.  Mr. Karr provided written and oral replies to the proposed

---

[5] Portions of the transcript of Mr. Karr's Deposition are attached to the First Reding Declaration, ECF No. 50-4, Ex. B.

UNITED STATES DISTRICT COURT
For the Northern District of California

1   action on December 7, 2009 and December 10, 2009, respectively.  JSUF 13.  These replies were

2   presented to Seattle Director of Field Operations Michelle James.  *Id.*  On July 6, 2010, Ms. James

3   issued a decision sustaining the charges, agreeing that demotion was warranted, and mitigating the

4   suspension to from 45 to 30 days.  JSUF 14.  On July 18, 2010, the CBP implemented the demotion

5   and suspension.  JSUF 15.[6]

6   **C.  Mr. Karr's Administrative Appeal to the MSPB**

7       On July 23, 2010, Mr. Karr filed an appeal with the MSPB challenging his demotion and 30-day

8   suspension (which began on July 18, 2010).  The appeal raised the following affirmative defenses:

9   harmful procedural error; disparate treatment based on disability discrimination (sleep apnea);

10  failure to accommodate his disability of sleep apnea; reprisal for engaging in EEO activity;

11  retaliation for engaging in whistle-blowing activities; and violation of 5 U.S.C. § 2302(b)(12), which

12  prohibits CBP from taking or failing to take any personnel action that would violate "any law, rule,

13  or regulation implementing, or directly concerning, the merit system principles contained in" 5

14  U.S.C. § 2301.  JSUF 78.

15      After the parties conducted both written discovery and depositions, the matter proceeded to

16  hearing, which lasted three days, and on March 18, 2011, the Administrative Judge ("AJ") issued an

17  Initial Decision affirming CBP's action.  JSUF 79.

18  **D.  Mr. Karr's Federal Action**

19      On May 5, 2011, Mr. Karr filed his federal complaint in district court.  Complaint, ECF No. 17.

20  His surviving claims are for disability discrimination and retaliation in violation of the

21

22      [6] As Defendant correctly points out, during his deposition, Mr. Karr refused to characterize
    his demotion as such.  JSUF 16 (citing Pl. Dep. 72:1-12, "Q: Were you ever demoted?  A. No, I –

23  no.  That's a vague question.  I'm not sure how to answer that.  Q: Has your title – job title ever
    changed since 2003 from supervisor to a regular officer?  A: Yes.  Q: But you don't consider that to

24  be a demotion?  A: I – that's purely speculative.  I basically kept my same GS12, step nine.  I'm not
    a supervisor anymore.").  Rather, Mr. Karr testified that when he returned from his 30-day

25  suspension, he was "given the choice to return as a supervisor to San Francisco Airport" or to
    become a regular officer.  JSUF 17 (citing Pl. Dep. 95:5-18).  Mr. Karr testified that he wanted to

26  return as a regular officer to reacquaint himself with fraud and to better control his schedule.  JSUF
    18, 19.  Mr. Karr understood that by choosing to remain as an officer, he could possibly limit his

27  grade and step level.  Pl. Dep. 97:13-19.

28

UNITED STATES DISTRICT COURT
For the Northern District of California

1    Rehabilitation Act of 1973, 29 U.S.C. § 791, as amended by the ADA, 12 U.S.C. § 12101, *et seq*.,

2    and the ADAAA, P.L. 110-325 (Claims One and Two).  *Id.* at 10-13, ¶¶ 51-83.  Mr. Karr requests an

3    injunction requiring the government to: (1) abolish prohibited personnel practices; (2) reinstate him

4    as a SCBPO; and (3) expunge "all negative documentation," including evidence of the four

5    suspensions and the demotion, from his personnel file.  *Id.* at 15.  He also requests economic

6    damages for lost pay, compensatory damages for emotional distress, attorney's fees and costs, and

7    any other relief the court may deem just and proper.  *Id.* at 15-16.

8        Defendant now moves for summary judgment on Plaintiff's remaining claims.  Motion, ECF No.

9    46.  Plaintiff opposes the motion.  Opposition, ECF No. 51.

10   **E. Plaintiff's Alleged Disability**

11       Mr. Karr alleges that he suffers from "sleep apnea, insomnia and other physical disabilities."

12   Complaint, ECF No. 1 at 1.  During his deposition, he testified that he felt Defendant discriminated

13   against him based on his sleep apnea.  JSUF 20.  He testified that he was first diagnosed with sleep

14   apnea in the late 1990s by his treating physician Roger Washington, M.D.  JSUF 23.  During the

15   MSPB hearing, Dr. Washington testified that he has treated Mr. Karr since 1994.  JSUF 24.  Dr.

16   Washington testified that Mr. Karr had sleep apnea and "issues with insomnia," so he referred him to

17   a specialist to confirm the sleep apnea diagnosis.  JSUF 25.  On April 26, 2006, Mr. Karr

18   participated in a sleep apnea study performed by Charles Anderson, M.D., at SleepMed of

19   California.  JSUF 26.  The study showed that of 456.5 minutes, Mr. Karr was asleep for 407.5

20   minutes.  During REM sleep, Mr. Karr's average oxygen saturation (Sa02) level was 94%

21   (considered normal), and his minimum Sa02 level was 80% (considered to be at the low end of

22   moderate desaturation; less than 80% is considered severe).  *Id*.[7]  During non-REM sleep, Mr. Karr's

23   average Sa02 level was 95% (considered normal), and his minimum Sa02 level was 88%

24   (considered mild desaturation).  *Id*.  Dr. Anderson concluded that Mr. Karr had severe REM-related

25   obstructive apnea, mild sleep apnea, and no EKG or ECG abnormalities.  *Id*.  Dr. Washington

_____

27       [7] Dr. Washington testified that the percentage of oxygen saturation indicates the degree
28   a person has a problem with oxygenation, and that greater than 89% meant there was no
     problem with oxygenation.  JSUF 27.

UNITED STATES DISTRICT COURT
For the Northern District of California

1  recommended that Mr. Karr lose weight, avoid caffeine and alcohol, and maintain a regular sleep

2  schedule.  JSUF 28.

3      Accordingly, Mr. Karr made significant lifestyle changes, particularly in his diet and exercise (he

4  began bicycling to public transportation and using public transportation), which resulted in his

5  cholesterol level dropping.  JSUF 29.  A follow-up sleep apnea test was conducted on December 18,

6  2009, by Sharad Dass, M.D.  JSUF 30.  Dr. Washington testified that this test showed that Mr. Karr

7  had improved significantly with respect to respiratory events and oxygen saturation levels, even

8  though Mr. Karr had never used a continuous positive airway pressure ("CPAP") machine.  JSUF 31.

9  Specifically, Mr. Karr spent 5 seconds at 84%, 1 hour and 17 seconds between 85% and 89%, and 6

10  hours and 11 seconds between 90% and 94%.  JSUF 32.  Mr. Karr's diagnosis at that time was mild

11  obstructive sleep apnea syndrome.  JSUF 33.

12      At his deposition in this action, Mr. Karr testified that his sleep apnea causes him to wake up two

13  to five times per night and that he often wakes up sleepy and groggy.  JSUF 34.  He also testified that

14  in 2006, Dr. Washington recommended that he get nine hours of sleep per night, but sometimes he

15  "might only end up with eight or seven and a half."  *Id*.  He further testified that sleep apnea does not

16  affect his ability to do his job.  JSUF 35.

17  **F.  Plaintiff's 2005 and 2009 EEO Complaints**

18      Mr. Karr became a supervisor in 1995.  JSUF 1.  As a supervisor, Mr. Karr's job duties included

19  understanding CBP's EEO processes and procedures.  JSUF 36.  He understood these policies,

20  regulations, and procedures and knew who to contact in order to make an EEO complaint.  JSUF 37.

21      Mr. Karr made two EEO complaints: one in 2005 and one in 2009.  JSUF 40.  In 2005, Mr. Karr

22  made an EEO complaint alleging age discrimination, after the agency proposed that he receive a

23  14-day suspension for misconduct.  JSUF 38.  His age discrimination claim was resolved in 2005

24  through mediation, and the 14-day suspension was reduced to a letter of reprimand.  JSUF 39.

25      On July 13, 2009, Mr. Karr contacted a field EEO Manager to seek informal counseling regarding

26  alleged discrimination.  JSUF 41.  The San Francisco EEO Manager, Ms. Katherine McPartland, met

27  with Mr. Karr, confirmed his claims, and, on August 19, 2009, issued a notice informing him of

28

C 11-02207 LB
ORDER

UNITED STATES DISTRICT COURT
For the Northern District of California

his right to file a formal EEO complaint within 15 days.  JSUF 42.[8]  Mr. Karr testified that he received the notice of his right to file a formal EEO complaint on August 20, 2009; however, he did not file his formal EEO complaint until September 6, 2009, 20 days later.  JSUF 44; Pl. Dep. 181:25-182:16, 194:24-195:18; Exs. 43, 46.  His EEO employment discrimination complaint alleged that he was subjected to a hostile work environment because of his physical disabilities (sleep apnea/hearing/sight/spine), prior EEO activity, and age, which resulted in several reassignments and suspensions.  JSUF 45.  According to Mr. Karr, these reassignments and suspensions included the following:

- In November 2007, CBP reassigned him to the East Bay Station in Oakland.
- In February 2009, CBP reassigned him to the Air Mail Facility at the San Francisco International Airport, denied him overtime, and denied him the opportunity to attend a Special Emphasis Program event.
- On June 22, 2009, CBP management suspended his employment for 21 days.
- On July 13, 2009, CBP management temporarily relieved him of his supervisory responsibilities, reassigned him to the Customhouse in San Francisco, California, removed his credentials, and denied him overtime.  JSUF 46.

By way of a letter dated September 22, 2009, Mr. Karr was informed that his EEO complaint was not timely filed because it was not submitted within 15 days of receipt of the notice, as required by 29 C.F.R. § 1614.106(b).  JSUF47.  He was provided with an opportunity to explain why the EEO complaint was not timely filed, and on October 6, 2009, he argued that it was timely and stated that "most correspondence requiring a response is usually in business days and does not include weekends or holidays."  JSUF 48.[9]

---

[8] Between the time Mr. Karr contacted the EEO on July 13, 2009 and the EEO's August 19, 2009 notice informing Mr. Karr of his right to file a formal EEO complaint, Mr. Karr and Ms. McPartland exchanged a number of emails, refining Mr. Karr's claims.  JSUF 43.

[9] Also, on October 23, 2009, Mr. Karr contacted the San Francisco EEO Manager because he wanted to amend his EEO complaint to include the DRB's October 19, 2009, proposal notice for the demotion and 45-day suspension as an additional discriminatory act.  JSUF 49.  The San Francisco EEO Manager informed him that the proposal did not raise an actionable issue and

On November 3, 2009, Mr. Karr's EEO complaint was dismissed for untimely filing. 29 C.F.R. § 1614.107(a)(2); JSUF 52. The dismissal notice was sent via e-mail on November 4, 2009, and it advised him that it constituted the final action by the agency and advised him of his appeal rights. JSUF 53. Mr. Karr received the email and forwarded it to his personal email account on December 8, 2009. *Id*. He did not file any timely appeal of this final agency decision. JSUF 54; MSPB0813-14; MSPB0943-44 (Plaintiff's MSPB Dep. 122:6-125:3).

**G. Mr. Karr's Requests for Accommodation**

Mr. Karr has submitted several notes from his treating physician and to CBP (and to legacy INS during his employment. He first recalls providing a note from Dr. Washington to someone at INS regarding his sleep apnea sometime prior to 2003. He believes that he requested not to work overtime for a short period of time and that this request was granted. JSUF 55.[10]

Mr. Karr believes he provided a second letter from Dr. Washington, dated January 14, 2004, to his supervisor at the time, Pat Macarenas. JSUF 57. The letter indicated that a schedule that required him to be awake after 10:00 p.m. or before 6:00 a.m. might be challenging for him. *Id*. Mr. Karr concedes that no modification of his schedule was required and that he was not specifically requesting any accommodation in January 2004. JSUF 58. Mr. Karr submitted another letter from Dr. Washington, this one dated January 10, 2006, to either Pat Macarenas or Robert Baldocchi, who would have been his supervisor at that time. JSUF 59. The letter stated that Mr. Karr's work assignments demanding wakefulness before 6:00 a.m. were likely to prove problematic. *Id*. Mr. Karr concedes, however, that he was not specifically requesting any type of accommodation or schedule change by way of the letter. JSUF 60. In February 2006, however, the then-Port Director, John Leyden, sent Mr. Karr a letter indicating that he would be exempt from shifts beginning before 8:00

---

that he would need to wait until a final decision issued (as it did in July 2010) so he could show actual harm. JSUF 50. Mr. Karr replied that he would consult with an attorney and decide if he wanted to pursue a separate EEO complaint. JSUF 51.

[10] Although he could not be certain, Mr. Karr testified that he may have provided a note from Dr. Washington dated October 10, 2002, to one of his supervisors, which requested that he avoid shifts that limit his sleep to less than eight hours, and that he focus on sleeping well between 3:00 a.m. and 7:00 a.m. JSUF 56.

UNITED STATES DISTRICT COURT
For the Northern District of California

**UNITED STATES DISTRICT COURT**
For the Northern District of California

1   a.m. for a period of six months.  JSUF 61.  The letter further stated that if Mr. Karr wanted to extend

2   the accommodation beyond the six-month period, Mr. Karr needed to provide additional

3   documentation from his doctor.  *Id*.  Again, Mr. Karr testified that he felt that at this time, his request

4   for any type of accommodation had been met.  JSUF 62.

5       Mr. Karr also recalls providing a note from Dr. Washington, dated June 22, 2006, to his Port

6   Director Leticia Romero.  JSUF 63.  This note requested that he not be given any shifts starting

7   before 8:00 a.m. for sixty days and requested that he not drive long distances.  *Id*.  He testified that he

8   was given a shift that would fit within the requested period of time.  JSUF 64.

9       Mr. Karr also testified that, after he was transferred from San Francisco to Oakland in November

10  2007, he made three requests to his then-supervisor, Chief Baldocchi, that he not be transferred to

11  Oakland as an accommodation of his sleep apnea.  JSUF 65.  Mr. Karr asked that his request be

12  relayed "up the chain of command."  *Id*.  He also testified that he and a San Francisco employee

13  requested that they be allowed to switch locations (allowing Mr. Karr to return to San Francisco), but

14  his request was denied.  JSUF 66.  He further testified that two other employees were allowed to

15  make such a switch.  *Id*.

16      On December 10, 2009, the same day he presented his oral reply in response to the proposed

17  demotion and 45-day suspension, Mr. Karr requested accommodation relating to his temporary

18  assignment performing non-supervisory duties at the San Francisco Customhouse.  JSUF 67.

19  Specifically, Mr. Karr asked to be moved to the San Francisco International Airport Air Mail Facility

20  as a reasonable accommodation for sleep apnea.  *Id*.  He wanted to go to the Air Mail Facility

21  because it was closer to his residence in San Mateo, and he claimed the easier commute would help

22  him with his sleep.  *Id*.  On December 15, 2009, Defendant engaged in an interactive dialogue with

23  Mr. Karr, and Mr. Karr agreed to remain working at the Customhouse and cooperate with his

24  supervisor in fashioning a modified work schedule to address his sleep concerns and resolve his

25  request for accommodation.  JSUF 68.  Mr. Karr indicated he would renew his request if the final

26  decision directed him to continue working at the Customhouse.  *Id*.

27  ///

28  ///

**UNITED STATES DISTRICT COURT**
For the Northern District of California

### III.  LEGAL STANDARD

**A.  Summary Judgment Standard**

Summary judgment is proper if the pleadings, the discovery and disclosures on file, and affidavits show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Material facts are those that may affect the outcome of the case.  *See id.* at 248. A dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party.  *See id.* at 248-49.

The party moving for summary judgment has the initial burden of identifying those portions of the pleadings, discovery and disclosures on file, and affidavits that demonstrate the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  When the nonmoving party has the burden of proof at trial, the moving party need point out only "that there is an absence of evidence to support the nonmoving party's case."  *Id.* at 325.  If the moving party meets this initial burden, the non-moving party must go beyond the pleadings and – by its own affidavits or discovery – set forth specific facts showing a genuine issue for trial.  *See* Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  If the non-moving party does not produce evidence to show a genuine issue of material fact, the moving party is entitled to summary judgment.  *See Celotex*, 477 U.S. at 323.

**B.  Rehabilitation Act Standard**

The Ninth Circuit has held that Section 501 of the Rehabilitation Act, 29 U.S.C. § 791, provides the exclusive remedy for federal employees claiming discrimination based on disability.  *Johnston v. Horne*, 875 F.2d 1415, 1420 (9th Cir. 1989), *overruled on other grounds, Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89 (1990).  The Supreme Court has adopted a three-part burden shifting test for claims of disability discrimination, based on a theory of disparate treatment.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  The test has been applied to employment discrimination based on disability.  *Raytheon Co. v. Hernandez*, 540 U.S. 44, 53–54 (2003).  First, the plaintiff has the initial burden under the statute of establishing a prima facie case for discrimination.  Second, if the plaintiff establishes a prima facie case, the burden of production shifts to the employer to articulate a

1   "legitimate, nondiscriminatory reason" for the employment decision. Third, if the employer offers a

2   nondiscriminatory reason, the burden returns to the plaintiff to show that the articulated reason is a

3   "pretext" for discrimination. *McDonnell*, 411 U.S. at 802–04.

## IV. DISCUSSION

### A. <u>Mr. Karr's Failure to Exhaust His Pre-2010 Claims</u>

6   In his complaint, Mr. Karr challenges several alleged discriminatory acts. These alleged

7   discriminatory acts include his 2007 reassignment to Oakland, three prior suspensions (2004, 2006,

8   and June 2009), and a July 13, 2009 transfer to the San Francisco Customhouse. Complaint, ECF No.

9   1 at 3-10. Mr. Karr asserts that he is entitled to challenge these acts here because he exhausted his

10  administrative remedies through an EEO complaint and/or through his MSPB appeal. *Id.* at 3. He

11  did not.

12  A federal employee asserting a claim of discrimination under the Rehabilitation Act must exhaust

13  administrative remedies before filing a civil action in district court. *Boyd v. U.S. Postal Serv.*, 752

14  F.2d 410, 413-14 (9th Cir. 1985). To exhaust administrative remedies, the aggrieved federal

15  employee must first attempt to resolve the matter by filing an informal complaint within 45 days of

16  the alleged discriminatory act, which then will trigger counseling by an EEO Counselor. 29 C.F.R. §

17  1614.105(a). If an informal resolution is not achieved, the employee must then file a formal EEO

18  complaint within 15 days of receiving the notice of right to file a formal EEO complaint. *See id.* at

19  §§ 1614.105(d), 1614.106. The employee may file a civil action in federal district court within 90

20  days of receiving notice of final agency action on the employee's formal complaint, or after 180 days

21  from the filing of the complaint if no final action has been taken by that time. 42 U.S.C. §

22  2000e-16(c); 29 C.F.R. § 1614.407(a)-(b).

23  During his employment with Defendant, Mr. Karr filed only two EEO complaints. JSUF 40. He

24  filed an age discrimination complaint in 2005, which is not at issue here, and he filed a second

25  discrimination complaint, HS-09-CBP-007326, in 2009, which was dismissed by the agency as

26  untimely and was not challenged on appeal. JSUF 38-40. He never sought EEO counseling regarding

27  the 2007 reassignment and the 2004 and 2006 suspensions within 45 days of the alleged

28  discriminatory or retaliatory conduct. Instead, he first contacted an EEO Manager regarding these

UNITED STATES DISTRICT COURT
For the Northern District of California

1  issues on July 13, 2009, when he complained that his November 2007 reassignment to Oakland, his

2  February 2009 reassignment to the San Francisco Air Mail Facility, his June 22, 2009 21-day

3  suspension, and his July 13, 2009 temporary reassignment to the Customhouse were discriminatory.

4  JSUF 41, 42.

5       Only Mr. Karr's June 22, 2009 21-day suspension and July 13, 2009 temporary reassignment to

6  the Customhouse were timely raised with an EEO Manager.  Id.  On August 19, 2009, the EEO

7  Manager issued a notice informing Mr. Karr of his right to file a formal EEO complaint within 15

8  days of receipt of the notice.  JSUF 42.  He received the notice of his right to file a formal EEO

9  complaint on August 20, 2009; however, he did not file his formal EEO complaint

10  (HS-09-CBP-007326) until September 6, 2009, 20 days later.  JSUF 44.  Accordingly, Mr. Karr

11  failed to timely file a formal EEO complaint with regard to the June 22, 2009 suspension and the July

12  13, 2009 temporary reassignment.

13       Moreover, even after receipt of the final agency decision dismissing HS-09-CBP-007326, Mr.

14  Karr again failed to file a timely challenge. The final agency decision issued on November 3, 2009 by

15  email, and it advised him that a civil action would need to be filed within 90 days of the date of

16  receipt.  JSUF 52.  Mr. Karr admits that he received the email, and in fact he forwarded the notice

17  from his work email account to his personal email account on December 8, 2009.  JSUF 53.  Mr. Karr

18  did not appeal the final agency decision, nor did he file a civil action within 90 days of receipt of the

19  final agency decision.  JSUF 54.  As such, Mr. Karr failed to exhaust administrative remedies through

20  the agency EEO process for any of his pre-2010 claims.[11]

21       Thus, the only claims that are properly before the court are Mr. Karr's claim that his July 2010

22

23       ───────────────

24       [11] Furthermore, the 2007 reassignment, the three prior suspensions, and the 2009
    reassignment to the Customhouse were not properly raised in Mr. Karr's MSPB appeal or through
    any separate MSPB appeal.  If an employee chooses to challenge an adverse action by filing a
25  MSPB appeal, the appeal must be filed within 30 days of the adverse employment action.  5 C.F.R. §
    1201.22(b).  Adverse employment actions are limited to five categories: a removal, a suspension for
26  more than 14 days, a reduction in grade, a reduction in pay, or a furlough of 30 days or less.  See 5
    U.S.C. § 7512.  As required by the MSPB, these events were not challenged within 30 days of the
27  date of the action, and, aside from the 21-day suspension, none of the instances even falls within the
    definition of an adverse action.  5 C.F.R. § 1201.22(b).
28

UNITED STATES DISTRICT COURT
For the Northern District of California

1  demotion and 30-day suspension constituted disability discrimination and retaliation.  The court

2  address these claims below.

3  **B. Mr. Karr's Discrimination Claim**

4  **1. Whether Mr. Karr Has Established a Prima Facie Discrimination Claim**

5      To state a prima facie case under the Rehabilitation Act, Mr. Karr must demonstrate that (1) he is

6  a person with a disability (2) who is otherwise qualified for employment and (3) suffered

7  discrimination because of his disability.  *Walton v. United States Marshals Service*, 492 F.3d 998,

8  1005 (9th Cir. 2007) (citing *Wong v. Regents of the Univ. of Cal.*, 410 F.3d 1052, 1058 (9th Cir.

9  2005)).

10          **i.  Whether Mr. Karr Was Disabled**

11      Defendant first contends that Mr. Karr cannot show that he is "disabled."  Motion, ECF No. 23-

12  25.  The Rehabilitation Act incorporates the standards of substantive liability set forth in the

13  Americans with Disabilities Act ("ADA").  *Id.*; 29 U.S.C. § 791(g).  Under the ADA, the term

14  "disability" means, with respect to an individual, "(A) a physical or mental impairment that

15  substantially limits one or more major life activities of such individual[12]; (B) a record of such an

16  impairment; or (C) being regarded as having such an impairment" as described in 42 U.S.C. §

17  12102(3).  42 U.S.C. § 12102(1).

18      On January 1, 2009, the ADA Amendments Act of 2008 ("ADAAA"), Pub. L. 110–325, 122 Stat.

19  3553, became effective. The ADAAA seeks to broaden the scope of disabilities covered by the ADA

20  after that scope had been narrowed by Supreme Court interpretation.  *See* Pub. L. 110–325, 122 Stat.

21  3553 (finding that Supreme Court precedent, e.g., *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534

22  U.S. 184 (2002), and Equal Employment Opportunity Commission ADA regulations narrowed the

23  definition of disability inconsistent with congressional intent).  Because the alleged discrimination

24

25          [12] "[M]ajor life activities include, but are not limited to, caring for oneself, performing
26  manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking,
    breathing, learning, reading, concentrating, thinking, communicating, and working," as well as "the
27  operation of a major bodily function, including but not limited to, functions of the immune system,
    normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory,
28  endocrine, and reproductive functions."  42 U.S.C. § 12102(2).

1    occurred after January 1, 2009, the ADAAA applies here.

2        42 U.S.C. § 12102(4), added to the statute by the ADAAA, provides, among other things, that

3    "[t]he term 'substantially limits' shall be interpreted consistently with the findings and purposes of"

4    the ADAAA.[13]   EEOC regulations, in turn, provide guidance for interpreting the term "substantially

5    limits."  *See* 42 U.S.C. § 12205a ("Rule of construction regarding regulatory authority").  According

6

7        [13] 42 U.S.C. § 12102(4) provides in full:

8
         The definition of "disability" in paragraph (1) shall be construed in accordance with
9        the following:

10       (A) The definition of disability in this chapter shall be construed in favor of broad
11       coverage of individuals under this chapter, to the maximum extent permitted by the
         terms of this chapter.
12       (B) The term "substantially limits" shall be interpreted consistently with the findings
         and purposes of the ADA Amendments Act of 2008.
13       (C) An impairment that substantially limits one major life activity need not limit
14       other major life activities in order to be considered a disability.
         (D) An impairment that is episodic or in remission is a disability if it would
15       substantially limit a major life activity when active.
16       (E)(i) The determination of whether an impairment substantially limits a major life
         activity shall be made without regard to the ameliorative effects of mitigating
17       measures such as--
18               (I) medication, medical supplies, equipment, or appliances, low-vision
                 devices (which do not include ordinary eyeglasses or contact lenses),
19               prosthetics including limbs and devices, hearing aids and cochlear
                 implants or other implantable hearing devices, mobility devices, or
20               oxygen therapy equipment and supplies;
21               (II) use of assistive technology;
                 (III) reasonable accommodations or auxiliary aids or services; or
22               (IV) learned behavioral or adaptive neurological modifications.
         (ii) The ameliorative effects of the mitigating measures of ordinary eyeglasses
23       or contact lenses shall be considered in determining whether an impairment
24       substantially limits a major life activity.
         (iii) As used in this subparagraph--
25               (I) the term "ordinary eyeglasses or contact lenses" means lenses that
                 are intended to fully correct visual acuity or eliminate refractive error; and
26               and
27               (II) the term "low-vision devices" means devices that magnify,
                 enhance, or otherwise augment a visual image.
28

UNITED STATES DISTRICT COURT
For the Northern District of California

C 11-02207 LB
ORDER

14

UNITED STATES DISTRICT COURT
For the Northern District of California

1    to the regulations, the term substantially limits "is not meant to [impose] a demanding standard" and

2    determining "whether an impairment 'substantially limits' a major life activity should not demand

3    extensive analysis." 29 C.F.R. § 1630.2(j)(1)(i) and (iii). The regulations further provide that the

4    "term 'substantially limits' shall be construed broadly in favor of expansive coverage[.]" 29 C.F.R. §

5    1630.2(j)(1)(i).

6        Mr. Karr testified that he was diagnosed as having sleep apnea by Dr. Washington in the late

7    1990s. JSUF 23. Dr. Washington testified at the MSPB hearing that Mr. Karr had sleep apnea and

8    "issues with insomnia," so he referred Mr. Karr to a specialist to confirm the sleep apnea diagnosis.

9    JSUF 25. In 2006, Dr. Anderson, a sleep specialist, later concluded, after conducting a sleep study on

10   Mr. Karr, that Mr. Karr had severe REM-related obstructive apnea, mild sleep apnea, and no EKG or

11   ECG abnormalities. JSUF 26. Mr. Karr underwent a follow-up sleep apnea test, conducted by Dr.

12   Dass, on December 18, 2009. JSUF 30. Dr. Dass concluded that Mr. Karr had, at that time, mild

13   obstructive sleep apnea. JSUF 33.

14       Mr. Karr also testified that his sleep apnea causes him to wake up two to five times per night and

15   that he often wakes up sleepy and groggy. JSUF 34. He also declared that, three or four times a

16   month, he either does not get any sleep or only gets one or two hours of sleep in a night. Karr

17   Declaration, ECF No. 51-1, ¶ 1. Mr. Karr further testified that his sleep apnea affects his ability to get

18   to work, but that once he is at work he is able to do his job. JSUF 35.

19       Viewing the facts relevant to Mr. Karr's sleep apnea in the light most favorable to him, and

20   assessing those facts under the more lenient analysis called for by the ADAAA, there is sufficient

21   evidence to permit a reasonable jury to find that Mr. Karr has a disability under the Rehabilitation

22   Act. See 29 C.F.R. § 1630.2(j)(1)(iii) ("The primary object of attention in cases brought under the

23   ADA should be whether covered entities have complied with their obligations and whether

24   discrimination has occurred, not whether an individual's impairment substantially limits a major life

25   activity."). The case law cited by Defendant, though helpful and not inapposite, analyzed the

26   disability question under the pre-ADAAA standard. *See Motion*, ECF No. 46 at 24-25 (citing *Pack v.*

27   *Kmart Corp.*, 166 F.3d 1300, 1306 (10th Cir. 1999) (plaintiff not substantially limited in sleeping

28   when during a 13-month period she slept two or three hours some nights, awoke without feeling

C 11-02207 LB
ORDER

UNITED STATES DISTRICT COURT
For the Northern District of California

1  rested, felt extremely drowsy and sleepy all the time, and took prescription sleep medication);

2  *Swanson v. University of Cincinnati*, 268 F.3d 307, 316 (6th Cir. 2001) (plaintiff not substantially

3  limited when he slept four to five hours a night); *Parayno v. Potter*, 2010 U.S. Dist. LEXIS 125331,

4  * 2-3, 8-10, Case No. C 09-487 MJP (W.D. Wash. Nov. 29, 2010) (where plaintiff testified that with

5  a work start time of 7:00 a.m., she could obtain five to six hours of sleep, the court found that

6  plaintiff was not substantially limited in the major activity of sleep by virtue of her insomnia and

7  fibromyalgia), affirmed by *Parayno v. Donahoe*, 2012 U.S. App. LEXIS 14172 (9th Cir. Jul. 11,

8  2012)).  Mr. Karr's cited case law also suggests that facts similar to the ones presented here get past

9  summary judgment.  *See* Opposition, ECF No. 51 at 26 (citing *Kravits v. Shinseki*, 2012 WL 604169

10  at *6 (W.D. Pa. Feb. 24, 2012) (finding a genuine issue of material fact where the plaintiff had been

11  diagnosed with sleep apnea and testified that his sleep apnea interfered with his sleep, which caused

12  him to be tired and interfered with his ability to concentrate); *Holland v. Shinseki*, 2012 WL 162333,

13  at *6 (N.D. Tex. Jan. 18, 2012) (finding a genuine issue of material fact as to whether the plaintiff

14  was disabled where the plaintiff, among other things, was unable, at times, to sleep more than one

15  hour per night); *Naber v. Dover Healthcare Associates, Inc.*, 765 F. Supp. 2d 622, 646-647 (D. Del.

16  2011) (finding that there was a question of fact as to whether the plaintiff's previously-diagnosed

17  depression was the cause of her inability to sleep one or two nights a week and whether that

18  sleeplessness is substantially limiting as compared to the average person in the general population,

19  and refusing to grant summary judgment her ADA discrimination claim for failure to set forth a

20  prima facie case that she is disabled (although the court did grant summary judgment for the

21  defendant because she could not prove that the defendant's legitimate, non-discriminatory reason for

22  her termination was pretextual).

23      **ii.  Whether Mr. Karr Was Qualified for Employment at the Time of His Suspension**

24  **and Demotion**

25      Defendant next argues that Mr. Karr cannot show that he was qualified for employment at the

26  time of his suspension and demotion.  Motion, ECF No. 46 at 25.  Under the ADA (and thus the

27  Rehabilitation Act), a "qualified individual" is an individual with a disability who, with or without

28  reasonable accommodation, can perform the essential functions of the employment position that such

1    individual holds or desires.  29 C.F.R. § 1630.2(m).  The term "essential functions" refers to the

2    "fundamental job duties of the employment position the individual with a disability holds or desires."

3    It does not "include the marginal functions of the position."  *Dark v. Curry County*, 451 F.3d 1078,

4    1087 (9th Cir. 2006) (citing 29 C.F.R. § 1630.2(n)(1)).

5        Defendant argues that Mr. Karr's repeated history or misconduct and his inability to follow CBP

6    policy rendered him unqualified to perform the essential functions of the SCBPO position.  Motion,

7    ECF No. 46 at 25 (citing *Lucero v. Hart*, 915 F.2d 1367, 1371-72 (9th Cir. 1990)).  Mr. Karr argues

8    that he has met this element because: (1) he was a supervisory officer for 15 years (from 1995 to

9    2010); (2) after his 2010 suspension, he was given the choice to return as a supervisor; and (3) he

10   never received a less-than-satisfactory overall annual performance rating.  JSUF 1, 2, 18; Karr

11   Declaration, ECF No. 51-1, ¶ 4.

12       Again, viewing the facts relevant to Mr. Karr's qualifications for employment in the light most

13   favorable to him, the court finds that Mr. Karr has demonstrated that there is a disputed issue of

14   material fact as to whether he was qualified for employment as a SCBPO at the time of his

15   suspension and demotion.

16          **iii.  Whether Mr. Karr Suffered Discrimination <u>Because of</u> His Disability**

17       Even so, to establish a prima facie case of discrimination, Mr. Karr must show that he suffered

18   discrimination <u>because of</u> his disability.  *See Walton v. United States Marshals Service*, 492 F.3d 998,

19   1005 (9th Cir. 2007) (citing *Wong v. Regents of the Univ. of Cal.*, 410 F.3d 1052, 1058 (9th Cir.

20   2005)).

21       Defendant contends that Mr. Karr cannot put forth evidence to do so.  So, what does he put forth?

22   Mr. Karr states in his opposition that "[a]lthough [he] believes that some punishment may have been

23   appropriate, the harshness of the punishment he received compared to others similarly situated, was

24   due to . . . disability discrimination."  Opposition, ECF No. 51 at 27.

25       Mr. Karr makes two arguments in support of this statement.  First, he notes that, in November

26   2007, he was transferred from San Francisco to Oakland and that he told his supervisors at the time

27   that the transfer would increase his commute time and violate his doctor's instruction that he not

28   drive long distances.  Opposition, ECF No. 51 at 27-28.  But even assuming this to be true, this does

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1  not demonstrate that Mr. Karr's punishment in 2010 was harsher than it otherwise would have been.

2  Mr. Karr also does not provide any admissible evidence to suggest that his request to switch locations

3  with a San Francisco-based employee was denied for discriminatory reasons. *See* JSUF 65-66. He

4  claims that the fact that two other employees were allowed to switch locations shows discriminatory

5  intent, but he provides the court with no information about those employees, their switch of locations,

6  or anything else about their situation. *See* Opposition, ECF No. 51 at 18.[14]  In short, Mr. Karr's first

7  argument does not help him here.

8      Second, Mr. Karr argues that the lesser punishments received by certain purportedly "similarly

9  situated" individuals gives rise to an inference that he received a harsher punishment because of his

10  disability. Opposition, ECF No. 51 at 27-29. Although he specifically mentions only a few of them,

11  twelve different individuals have been presented as possibly being "similarly situated" to him. *See*

12  Opposition, ECF No. 51 at 28-29; Reply, ECF No. 54 at 8-11. Eight of the twelve—Examples 1-

13  8—are the employees involved in the "like and similar" disciplinary cases that were presented to Ms.

14  James. These can be summarized as follows:

15  •   Example 1: A Supervisory Sector Enforcement Specialist with no prior disciplinary history was

16      charged with Misuse of Position and was given a seven-day suspension for ordering a Sector

17      Enforcement Specialist to perform an improper search of the Arizona Criminal Justice

18      Information System.

19  •   Example 2: A Border Patrol Agent with two prior suspensions (a one-day and a fourteen-day

20      suspension) was charged with Creating the Appearance of a Conflict of Interest and was given a

21      fifteen-day suspension for engaging in casual conversation and exchanging email addresses with a

22      female detainee.

23  •   Example 3: A Maintenance Mechanic Supervisor with no prior disciplinary history was charged

24      with Creating the Appearance of a Conflict of Interest and was given a fifteen-day suspension for

25      submitting his or her brother's welding company as a bidder on a project for which he requested

---

27      [14] Mr. Karr does state in his declaration that, "to his knowledge," the two employees had not
28  engaged in protected activity and were not disabled, but his statement is unsupported. *See* Karr
    Declaration, ECF No. 51-1, ¶ 3.

1       funds.

2   •   Example 4: A Senior Patrol Agent with no prior disciplinary history was charged with Misuse of

3       Position and was given a seven-day suspension for identifying himself or herself as a border

4       patrol agent and conducting an investigation of an individual while off-duty and under the

5       influence of alcohol.

6   •   Example 5: A Secretary with one prior suspension (a five-day suspension for misuse of customs

7       identification) was charged with Misuse of Position and was given a twenty-day suspension for

8       falsely identifying himself or herself to police officers as a United States Customs Agent.

9   •   Example 6: A Supervisory Entry Specialist with no prior disciplinary history was charged with

10      Misuse of Position and was given a letter of reprimand for telling a police officer that he or she

11      was a law enforcement officer and worked for CBP to avoid receiving a traffic citation.

12  •   Example 7: A CBP Officer with no prior disciplinary history was charged with Misuse of the

13      Treasury Enforcement Communication System (TECS) and was given a three-day suspension for

14      querying TECS for authorized purposes on four separate occasions in 2004.

15  •   Example 8: A Chief SCBPO with no prior disciplinary history was charged with Instructing a

16      Subordinate Employee to Include Inaccurate Information in an Official Report, Lack of Candor,

17      and Negligent Performance of Supervisory Duties and was given a two-day suspension for

18      ordering a SCBPO to change a report to reflect that a certain individual was male, not female, for

19      not being fully forthcoming during the subsequent investigation, and failing to investigate or take

20      appropriate action after he or she learned about a violation of CBP policy.

21  *See* Second Reding Declaration, ECF No. 54-1 at 4-42, 82-96 (MSPB0296-0334; MSPB0881-0895).

22  The cases of four additional purported "similarly situated" individuals also were discovered during

23  discovery.  These cases can be summarized as follows:

24  •   Example A: An SCBPO with one prior letter of reprimand was charged with Illegal Possession of

25      a Weapon and Lack of Candor and was given a ten-day suspension because he illegally used his

26      or her CBP credentials to purchase an assault weapon.

27  •   Example B: An SCBPO with no prior disciplinary history was charged with Unauthorized Use of

28      TECS and was given a five-day suspension for querying TECS for unauthorized purposes twenty-

UNITED STATES DISTRICT COURT
For the Northern District of California

1    five times over ten years.

2    •   Example C: An SCBPO with no prior disciplinary history was charged with Improper Conduct,

3        Failure to Report Misconduct, Lack of Candor, and Improper Use of TECS and was given a two-

4        day suspension for querying his or her own name without authorization.

5    •   Example D: An SCBPO with no prior disciplinary history was charged with Inappropriate

6        Display of a Firearm and given a five-day suspension for placing his or her fully loaded service-

7        issue firearm on a bed while off-duty and visiting his wife in the hospital.

8    *See* Errata to Second Reding Declaration, ECF No. 58 at 8-32 (US000563-587).

9        Mr. Karr correctly notes (albeit in a footnote) that the Ninth Circuit has stated that "whether two

10   employees are similarly situated is ordinarily a question of fact." *Beck v. Unites Food & Commercial*

11   *Workers Union Local 99*, 506 F.3d 874, 885 n.5 (9th Cir. 2007); *see Hawn v. Executive Jet Mgmt.,*

12   *Inc.*, 615 F.3d 1151, 1157 (9th Cir. 2010).  "The employees' roles need not be identical; they must

13   only be similar 'in all material respects.'" *Moran v. Selig*, 447 F.3d 748, 755 (9th Cir. 2006); *see*

14   *Hawn*, 615 F.3d at 1157; *Aragon v. Republic Silver State Disposal, Inc.*, 292 F.3d 654, 660 (9th Cir.

15   2002).  "Materiality will depend on context and the facts of the case." *Hawn*, 615 F.3d at 1157.

16       Generally, in the Ninth Circuit, "individuals are similarly situated when they have similar jobs

17   and display similar conduct." *Vasquez v. County of Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2003)

18   (employees were not similarly situated where the type and severity of an alleged offense was

19   dissimilar); *cf. Freeman v. Astrue*, 405 Fed. Appx. 148, 151 (9th Cir. 2010) (holding that "employees

20   who have not engaged in problematic conduct of comparable seriousness, or employees with

21   differing levels of responsibilities are not similarly situated"); *Riser v. Target Corp.*, 458 F.3d 817,

22   821-22 (8th Cir. 2006) (holding that employees who had different duties and who worked in different

23   locations than the plaintiff were not similarly situated).  The Ninth Circuit has also expressed that

24   "[e]mployees in supervisory positions are generally deemed not to be similarly situated to lower level

25   employees." *Vasquez*, 349 F.3d at 641 (finding that one employee was not similarly situated to

26   another in part because "her position was a supervisory one, with much greater responsibility").

27       Under *Vasquez* and the facts of this case, the court believes that Mr. Karr's supervisory position is

28   a material distinction that separates him from the non-supervisory employees cited above (Examples

2, 4, 5, and 7).  As an SCBPO, the CBP made clear that Mr. Karr, like the other supervisory employees, is held to a higher ethical standard than non-supervisory employees.  *See* First Reding Declaration, ECF No. 50-1 at 5 (MSPB0285: July 6, 2010 Letter from Ms. James suspending and demoting Mr. Karr and noting that he is held to a higher standard as a supervisory employee); *see also* Second Reding Declaration, ECF No. 54-1 at 7, 18, 39, 87 (disciplinary letters for Examples 1, 3, 6, and 8 and noting higher standard for supervisors); Errata to Second Reding Declaration, ECF No. 58 at 8, 15, 22, 27 (same for Examples A-D).  The court therefore finds that Examples 2, 4, 5, and 7 are not similarly situated to Mr. Karr and will not consider them here.

The court comes to a different conclusion with respect to the supervisory employees (Examples 1, 3, 6, and 8, and Examples A-D).  While their backgrounds, positions, charges, and punishments differ from Mr. Karr's, the court does not believe that a clear material distinction can be made under the applicable authority—authority that suggests that closer calls like these are questions of fact.  *See* *Hawn*, 615 F.3d at 1157.  Therefore, the court believes that Mr. Karr has raised a genuine issue of material fact as to whether Examples 1, 3, 6, and 8, and Examples A-D were similarly situated to him.  Thus, for purposes of the remainder of this order, the court assumes, but does not find, that Examples 1, 3, 6, and 8, and Examples A-D, are similarly situated to Mr. Karr.

In light of Mr. Karr's relatively low burden at the prima facie stage of the McDonnell Douglas test, *see Hawn*, 615 F.3d at 1158, and the circumstances surrounding the discipline received by Mr. Karr and by the other supervisory employees, the court believes that Mr. Karr has raised an inference of discrimination and that the court must proceed to the second stage of the *McDonnell Douglas* inquiry.

**2.  Whether Mr. Karr Has Shown that Defendant's Articulated Legitimate, Nondiscriminatory Reason Is a Pretext for Discrimination**

Assuming that Mr. Karr has established a prima facie claim of disability discrimination, Defendant has articulated a legitimate, nondiscriminatory reason for suspending and demoting Mr. Karr.  As Defendant explains, Mr. Karr was demoted and suspended because he abused his authority by directing a subordinate to perform a search to see if his wife was onboard a flight.  After careful consideration of the DRB's proposed discipline, and considering all of the factors, including that

UNITED STATES DISTRICT COURT
For the Northern District of California

1  submitted by Mr. Karr in his written and oral replies, Ms. James decided to demote and

2  suspended him for 30 days.  JSUF 80-85; MSPB0285-87.  This decision has been affirmed by

3  the MSPB and again, by this Court. MSPB0830-71; 3/7/2012 Order, ECF No. 33.

4      Thus, Mr. Karr must show that Defendant's articulated reason is a pretext for disability

5  discrimination.  A plaintiff can prove pretext either "(1) indirectly, by showing that the employer's

6  proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not

7  believable, or (2) directly, by showing that unlawful discrimination more likely motivated the

8  employer." *Chuang v. Univ. of Cal. Davis*, 225 F.3d 1115, 1127 (9th Cir. 2000).

9      Direct evidence "is evidence which, if believed, proves the fact of discriminatory animus without

10  inference or presumption," and it "typically consists of clearly sexist, racist, or similarly

11  discriminatory statements or actions by the employer." *Coghlan v. Am. Seafoods Co.*, 413 F.3d

12  1090, 1094-95 (9th Cir. 2005).  "A plaintiff can show pretext directly, by showing that discrimination

13  more likely motivated the employer, or indirectly, by showing that the employer's explanation is

14  unworthy of credence." *Vasquez*, 349 F.3d at 641.  Direct evidence consists of clearly racist or

15  discriminatory statements or actions by the employer, and very little direct evidence is required to

16  raise a genuine issue of material fact. *Coghlan*, 413 F.3d 1090, 1095 (9th Cir. 2005).

17      Mr. Karr has presented no direct evidence of pretext, and so he must rely upon indirect evidence.

18  *See* Opposition, ECF No. 51 at 16-24, 29.  Indirect, circumstantial evidence must be "specific and

19  substantial" to defeat summary judgment. *Coghlan*, 413 F.3d at 1095; *Vasquez*, 349 F.3d at 642.

20  And "[a 'plaintiff cannot create a genuine issue of pretext to survive a motion for summary judgment

21  by relying solely on unsupported speculations and allegations of discriminatory intent.'" *Jackson v.

22  Geithner*, No. CV F 11-0055 LJO SKO, 2011 U.S. Dist. LEXIS 59483, at *34 (E.D. Cal. Jun. 3,

23  2011) (quoting *Crawford v. MCI Worldcom Communications, Inc.*, 167 F. Supp. 2d 1128, 115 (S.D.

24  Cal. 2001).

25      Upon review of the papers submitted and the arguments of counsel at the September 20, 2012

26  hearing, the court does not believe that Mr. Karr has presented "specific and substantial" evidence

27  that would allow a reasonable jury to conclude that Defendant's articulated a legitimate,

28  nondiscriminatory reason for suspending and demoting him is pretext for discrimination.  Mr. Karr

makes several arguments, but none of them carries the day.

First, Mr. Karr argues that Ms. James "agreed to give [Mr. Karr] a harsher punishment than she would have otherwise." Opposition, ECF No. 51 at 24. This argument is completely lacking in evidentiary support: Mr. Karr, for instance, does even not say with whom Ms. James supposedly so agreed.

Second, Mr. Karr argues that Ms. James "was dissembling" during her MSPB testimony when she "unreasonably refused to acknowledge" and "unreasonably denied" that certain other employees' conduct was "more serious" than Mr. Karr's conduct. Opposition, ECF No. 51 at 24. This also is unpersuasive, as the statements Mr. Karr cites do not demonstrate that she discriminated against him on the basis of his disability. Indeed, as mentioned above, Ms. James stated that while she did in fact consider Mr. Karr's statements about his sleep apnea, she considered them as a <u>mitigating</u> factor, not an aggravating factor, in her decision, and she reduced the proposed suspension from 45 to 30 days. JSUF 12, 14, 94, 95. Mr. Karr does not dispute this. JSUF 95.

Third, Mr. Karr argues that Defendant had a pattern of discriminating against him, and that this is demonstrated by Defendant's failure to accommodate his disability. Opposition, ECF No. 51 at 16-18. But as described above, Mr. Karr's requests for accommodation either were granted or otherwise met, or, as in the instance of his November 2007 transfer to Oakland, Mr. Karr presented no admissible evidence to suggest that his request to switch locations with a San Francisco-based employee was denied for discriminatory reasons. *See* JSUF 55-67.

Fourth, Mr. Karr presents unsupported speculation as part of a "cat's paw" theory of discriminatory intent. *See Poland v. Chertoff*, 494 F.3d 1174, 1182 (9th Cir. 2007). Under this theory, "if a subordinate, in response to a plaintiff's protected activity, sets in motion a proceeding by an independent decisionmaker that leads to an adverse employment action, the subordinate's bias is imputed to the employer if the plaintiff can prove that the allegedly independent adverse employment decision was not actually independent because the biased subordinate influenced or was involved in the decision or decisionmaking process." *Id.*

*Cafasso v. General Dynamics C4 Systems, Inc.*, 637 F.3d 1047 (9th Cir. 2011), is instructive. There, the plaintiff, Mary Cafasso, alleged that her former employer, General Dynamics C4 Systems

UNITED STATES DISTRICT COURT
For the Northern District of California

("GDC4S"), defrauded the government by withholding disclosure of new inventions which, GDC4S had agreed by contract, the government had rights to use and license. *Id*. at 1051-52. Ms. Cafasso discovered the alleged fraud and made repeated inquiries and requests for internal audits. *Id*. at 1052. She claimed that as a result of her inquiries and requests, GDC4S retaliated against her by eliminating her department and position. *Id*. Christopher Marzilli was the GDC4S official who eliminated her department and position. *Id*. at 1060.

Like Mr. Karr, Ms. Cafasso relied on a "cat's paw" theory. *Id*. at 1061. On appeal, the Ninth Circuit noted that "[t]he only evidentiary support [Ms. Cafasso] offers is first, the fact that some GDC4S officials who were in a position to influence [Mr.] Marzilli knew of her ATIRP-related inquiries and requests, and second, the cryptic statement of a coworker that unspecified "people" had, for unknown reasons, "poisoned the water," "gotten to Chris Marzilli," and "placed a cloak of poison over [Ms. Cafasso's] office with Chris Marzilli." *Id*. Moreover, Mr. Marzilli testified that he did not know of Ms. Cafasso's inquiries and requests at the time of his allegedly retaliatory decision, and Ms. Cafasso admitted in deposition that she had no reason to disbelieve Mr. Marzilli's account. *Id*. at 1060.

"This evidence, without more," the Ninth Circuit concluded, "is not enough to sustain [Ms.] Cafasso's burden at summary judgment." *Id*. at 1061. It explained:

> To prove this theory at trial, [Ms.] Cafasso would have to establish that one of [Mr.] Marzilli's subordinates, in response to [Ms.] Cafasso's protected activity, "set[ ] in motion" [Mr.] Marzilli's decision to eliminate [Ms.] Cafasso's department and job, and that the subordinate "influenced or was involved in the decision or decisionmaking process." *Poland*, 494 F.3d at 1182. The evidence adduced by [Ms.] Cafasso establishes only that this set of events could conceivably have occurred; it does not give rise to a reasonable inference that it did in fact occur. To find liability on this evidence would require undue speculation. To survive summary judgment, a plaintiff must set forth non-speculative evidence of specific facts, not sweeping conclusory allegations. *Mackie v. Rieser*, 296 F.3d 909, 915–16 (9th Cir. 2002); *Leer v. Murphy*, 844 F.2d 628, 634 (9th Cir. 1988).

*Cafasso*, 637 F.3d at 1061.

Mr. Karr's "evidence" also does not give rise to a reasonable inference that his theory—that someone "contaminated the decisionmaking process"—in fact occurred. As Defendant accurately describes, Mr. Karr speculates that there is a "possibility" that "one or more of [Mr. Karr's] managers who had a retaliatory or discriminatory motive against [Mr. Karr], directly influenced or convinced

UNITED STATES DISTRICT COURT
For the Northern District of California

1   Ms. James to give [Mr. Karr] a harsher punishment than she otherwise would have done."

2   Opposition, ECF No. 51 at 6.  Mr. Karr, however, cannot name anyone who discriminated against

3   him and can only "speculate as to who tainted the decisionmaking process with retaliatory or

4   discriminatory bias." *Id.* at 22.

5        Mr. Karr also states that "there is evidence that a nondecisionmaker influenced the ultimate

6   decision maker [Michele James] in an attempt to ensure harsher treatment of [Mr. Karr] than

7   otherwise would have been expected."  Opposition, ECF No. 51 at 23.  Contrary to Plaintiff's

8   speculation, Ms. James testified that no one provided outside information to her, aside from what was

9   contained in the agency file, the "like and similar" cases, and the written reply.  Second Reding

10   Declaration, ¶ 2; Ex. A (MSPB1253 (Hearing Transcript Vol. I, 24:9-14)).  She further testified that

11   she had no conversations with David Salazar, the individual who proposed Mr. Karr's demotion and

12   45-day suspension, or Richard Vigna, the Director of Field Operations at the time.  *Id.* (MSPB1249

13   (Hearing Transcript Vol. I, 20:4-6); MSPB1252 (Hearing Transcript Vol. I, 23:2-13)).  The only

14   individuals with whom Ms. James spoke regarding the proposed decision and the ultimate decision

15   were a Labor Employee Relations employee named Phia Williams, and counsel, *id.* at MSPB1252

16   (Hearing Transcript Vol. I, 23:14-18), and Mr. Karr presents no evidence that they were biased

17   against him.

18        Fifth, and finally, Mr. Karr repeats his argument that other individuals, whom he believes are

19   "similarly situated" to him but whom he claims are not disabled, received less harsh punishments

20   than he did, and so this shows Defendant's pretext.  As stated above, the court found the four non-

21   supervisory employees not to be similarly situated to Mr. Karr, but assumes that the remaining

22   supervisory employees (Examples 1, 3, 6, and 8, and Examples A-D) are similarly situated to him.

23        Yet even considering them, the court does not believe, under Mr. Karr's higher burden at this

24   stage of the *McDonnell Douglas* inquiry[15], that a reasonable jury could find that they show that

25

26        ───────────────

27        [15] "Even though a comparison to 'similarly situated' individuals may be relevant both to [a plaintiff's] prima facie case and proof of pretext, these inquiries constitute distinct stages of the *McDonnell Douglas* burden-shifting analysis."  *Hawn*, 615 F.3d at 1158 (citing *Furnco Constr.*

28   *Corp. v. Waters*, 438 U.S. 567, 577 (1978) and *Lynn v. Regents of the Univ. of Cal.*, 66 F.2d 1337

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

Defendant's articulated a legitimate, nondiscriminatory reason for suspending and demoting Mr. Karr is a pretext for disability discrimination. The problem with Mr. Karr's argument is that Mr. Karr had a significant prior disciplinary history that was specifically taken into account when his punishment was being considered. As Defendant points out, Examples 1, 3, 6, and 8 involved supervisors or chiefs who had no history of prior discipline (and only Example 1, for that matter, involved a case where a supervisor had requested a subordinate to query a database), Second Reding Declaration, ¶ 2; Ex. A (MSPB0296-334; MSPB0881-895 (proposal and decision letters for Examples 1-8)), and none the SCBPOs in the San Francisco Field Office had a prior history of discipline even close to that of Mr. Karr, Second Reding Declaration, ¶ 3; Ex. B (proposal and decision letters for Examples B-D); Errata to Second Reding Declaration, Ex. B (including Example A). Mr. Karr, on the other hand, was a supervisor who had been disciplined three times—with increasing severity—prior to his 2009 suspension and demotion, *see* JSUF 3-5[16], and his "repeated incidents of [his] failure to follow the chain of command" was emphasized in Ms. James's disciplinary letter, First Reding Declaration, ECF No. 50-1 at 6. Moreover, like these other supervisory employees, Mr. Karr, too, received a light suspension for his first offense. *See* JSUF 3 (Mr. Karr received a three-day suspension for: (1) failing to follow instructions directing him not to go outside the chain of command and independently contact representatives of foreign governments; and (2) granting a waiver allowing a foreign national to enter the country without obtaining authorization from his chain of command.). That he received a harsher punishment than employees with no prior discipline does not suggest discrimination, it suggests escalation in light of Mr. Karr's repeated violations of CBP policy.

---

(9th Cir. 1981)). But "[t]he difference between the first and third steps of the *McDonnell Douglas* framework is not without some consequence." *Id.* "Among other things, a plaintiff's burden is much less at the prima facie stage than at the pretext stage." *Id.* (citations omitted); *see Wheeler v. Aventis Pharm.*, 360 F.3d 853, 857 (8th Cir. 2004) (describing pretext stage as "rigorous," but prima facie stage as "not onerous").

[16] As described above, Mr. Karr received: (1) a May 2004 3-day suspension for failure to follow supervisory instructions and failure to comply with standards, policies, and regulations issued by the service; (2) a December 2006 10-day suspension for failure to follow supervisory instructions; and (3) a 21-day suspension in June 2009 for not following the chain of command and making direct contact with the Consulate of Qatar. JSUF 3-5.

C 11-02207 LB
ORDER

UNITED STATES DISTRICT COURT
For the Northern District of California

1    Finally, Mr. Karr's arguments are even less compelling in the face of Defendant's evidence,

2    which suggests that not only was Mr. Karr <u>not</u> punished because of his disability but also suggests

3    that his punishment actually may have been was <u>decreased</u> because of it.  Defendants points to the

4    testimony of Michele James, the deciding official with regard to Mr. Karr's discipline.  Specifically,

5    Ms. James testified that before she was assigned the case, she knew nothing about Mr. Karr and had

6    no knowledge regarding any of his past EEO activity, sleep apnea, or "whistleblowing."  JSUF 87,

7    88.  Ms. James further testified that she first became aware of Mr. Karr's sleep apnea when he raised

8    the issue at the oral reply to the proposed discipline.  JSUF 89.  (Indeed, Mr. Karr similarly testified

9    that he, along with his attorney Mary Dryovage, informed Ms. James regarding his alleged disability

10   at the oral reply, because Ms. James did not know anything about it. JSUF 90.)  Ms. James testified

11   that she took this information about Mr. Karr's alleged disability at face value, and she did not do any

12   further research on sleep apnea to confirm or deny what Plaintiff said during his oral reply.  JSUF 91.

13   She also testified that although she knew that Mr. Karr had filed a complaint for disability

14   discrimination, she did not consider this in her decision.  JSUF 92.  Finally, in making her decision to

15   demote Mr. Karr and suspend him for 30 days, Ms. James considered the information about his

16   alleged disability, including what he said he was doing that night (i.e., trying to decide whether he

17   should go to the gym prior to his wife coming home), and how it might have caused some stress to

18   him because he wanted to plan out his schedule for that evening.  JSUF 94.  And although Ms. James

19   "could not connect" how Mr. Karr's sleep apnea would cause him to ask a subordinate to access

20   privileged information when he could have found alternative means of getting that information, she

21   still considered Mr. Karr's statements about his sleep apnea as a mitigating factor in her decision to

22   demote and suspend him.  JSUF 94, 95.  She then reduced the proposed suspension from 45 to 30

23   days.  JSUF 12, 14.

24    Mr. Karr does not present any evidence to contradict this understanding of the facts.  Nor does

25   Mr. Karr present evidence that either the Discipline Review Board, which originally proposed that he

26   be suspended from duty and pay for 45 days and be demoted from the position of GS-12 supervisory

27   CBP officer to the position of GS-11 journeyman CBP officer, or Ms. James, who agreed that

28   demotion was warranted but mitigated the suspension to from 45 to 30 days, even knew about his

C 11-02207 LB
ORDER

1   alleged disability (or any of his prior requests for reasonable accommodation, for that matter).[17]

2       Accordingly, the court finds that, even assuming that Mr. Karr has established a prima facie case

3   of disability discrimination, he has not offered specific and substantial evidence demonstrating why

4   Defendant's legitimate and non-discriminatory explanations are unworthy of credence.  *See*

5   *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1062 (9th Cir. 2002).  Defendant's motion for

6   summary judgment on Mr. Karr's disability discrimination claim, then, is **GRANTED**.

7   **C. Mr. Karr's Retaliation Claim**

8       To establish a prima facie case of retaliation under the ADA, a plaintiff must show (1) that he or

9   she engaged in or was engaging in activity protected by the ADA, (2) the employer subjected him or

10   her to an adverse employment decision, and (3) that there was a causal link between the protected

11   activity and the employer's action.  *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1121 (9th Cir. 2000)

12   (overruled on other grounds) (citing *Yartzoff v. Thomas*, 809 F.2d 1371, 1375 (9th Cir. 1987)).

13       Defendant apparently does not challenge that Mr. Karr meets the first and second elements, but

14   she does argue that Mr. Karr cannot meet the third one: that there was a causal link between Mr.

15   Karr's protected activity and his suspension and demotion.  First, Defendant puts forth evidence that

16   the officials involved with determining Mr. Karr's proposed and final discipline did not know about

17   or consider his EEO complaint in their decisions.  The DRB official who provided Mr. Karr's

18   proposed discipline, David Salazar, testified at the MSPB hearing that he did not know that Mr. Karr

19   had a disability, made a request for reasonable accommodation, or had any EEO issues.  *See* Second

20   Reding Declaration, ECF No. 54-1, ¶ 2; Ex. A (MSPB1545-46 (Hearing Tran., Vol. II,

21   313:12-314:7).  And Ms. James testified that although she knew that Mr. Karr had filed a complaint

22   for disability discrimination, she did not consider this in her decision.  JSUF 92.  Second, Defendant

23   points out that while Mr. Karr testified that he has felt like a "target" at the agency, he could not

24   name any individuals who retaliated against him.  Pl. Dep. 213:7-214:5, 220:21-221:2 ("Q: . . .Are

25

26       [17] Indeed, as Defendants points out, the DRB official who provided Mr. Karr's proposed

27   discipline, David Salazar, testified at the MSPB hearing that he did not know that Mr. Karr had a
    disability, made a request for reasonable accommodation, or had any EEO issues.  *See* Second
    Reding Declaration, ECF No. 54-1, ¶ 2; Ex. A (MSPB1545-46 (Hearing Tran., Vol. II,

28   313:12-314:7).

1    there any specific individuals that you feel retaliated against you?  A: This is a hard, vague question

2    that I cannot specifically put names down without factual back up.").  He also testified that he did not

3    believe Ms. James, the deciding official related to his suspension and demotion, retaliated against

4    him.  Pl. Dep. 221:7-10 ("Q: Do you feel that [Ms. James] retaliated against you on the basis of your

5    alleged disability in making that decision?  A: No.").

6         Mr. Karr does not challenge Defendant's points above.  Instead, citing and quoting *Villiarimo v.*

7    *Aloha Island Air, Inc.*, 281 F.3d 802, 812 (9th Cir. 2002), he argues that "[a] causal link between a

8    protected activity and the alleged retaliatory action 'can be inferred from timing alone' when there is

9    a close proximity between the two.  Opposition, ECF No. 51 at 15.  What Villiarimo actually says is:

10   "[I]n some cases, causation can be inferred from timing alone where an adverse employment action

11   follows on the heels of protected activity."  *Id.* (emphasis added) (citing *Passantino v. Johnson &*

12   *Johnson Consumer Prods., Inc.*, 212 F.3d 493, 507 (9th Cir. 2000); *Miller v. Fairchild Indus.*, 885

13   F.2d 498, 505 (9th Cir. 1989); *Yartzoff*, 809 F.2d at 1376).  And a review of the cases *Villiarimo* cites

14   for this point—*Pasantino*, *Miller*, and *Yartzoff*—shows that close temporal proximity must be paired

15   with an employer's knowledge of the plaintiff's protected activities.  *See Passantino*, 212 F.3d at 507

16   (plaintiff voiced sex discrimination-related complaints to her supervisor, who thereafter gave plaintiff

17   lower performance evaluations and subsequently passed her over for promotion); *Miller*, 885 F.2d at

18   505 (plaintiffs were laid off only 59 days and 42 days, respectively, after EEOC hearings, but the

19   record contained evidence that the Fairchild management personnel who participated in the layoff

20   decisions were aware that plaintiffs had filed EEOC charges, had attended the EEOC fact-finding

21   conference, and were the very people whose actions had prompted plaintiffs' complaints); *Yartzoff*,

22   809 F.2d at 1376 ("Causation sufficient to establish the third element of the prima facie case may be

23   inferred from circumstantial evidence, such as the employer's knowledge that the plaintiff engaged in

24   protected activities and the proximity in time between the protected action and the allegedly

25   retaliatory employment decision."; record contained evidence that plaintiff's supervisors—who

26   issued a sub-average performance rating approximately three weeks after the plaintiff, the

27   supervisors, and the EEO counsellor met to discuss the plaintiff's complaints—were aware of his

28   Title VII complaints and of his participation in administrative investigations).  Of course, it makes

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

UNITED STATES DISTRICT COURT
For the Northern District of California

1  sense that, to prove causation, a plaintiff must be able to show that the person who allegedly

2  retaliated against an employee for engaging in protected activity must also have known that the

3  employee engaged in the protected activity.  *See Blanchard v. Lahood*, No. 10-55524, 461 Fed.

4  Appx. 542, 544, (9th Cir. Dec. 7, 2011) ("[I]t is causation, and not temporal proximity alone, which is

5  an element of a plaintiff's retaliation claim.") (citing *Porter v. California Dept. of Corrections*, 419

6  F.3d 885, 894-95 (9th Cir. 2005)); *Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 796 (9th Cir. 1982)

7  ("Essential to a causal link is evidence that the employer was aware that the plaintiff had engaged in

8  the protected activity.") (citing *Gunther v. County of Washington*, 623 F.2d 1303, 1316 (9th Cir.

9  1979), aff'd., 452 U.S. 161 (1981); *Aguirre v. Chula Vista Sanitary Serv.*, 542 F.2d 779, 781 (9th Cir.

10  1976)).

11      Here, the relevant timeline is this:

12  •  On July 13, 2009, Mr. Karr contacted a field EEO Manager to seek informal counseling regarding

13     alleged discrimination.  JSUF 41.

14  •  On September 6, 2009, Mr. Karr filed a formal EEO complaint, in which he alleged that he was

15     subjected to a hostile work environment because of his physical disabilities (sleep

16     apnea/hearing/sight/spine), prior EEO activity, and age, which resulted in several reassignment

17     and suspensions.  JSUF 44; 45.

18  •  On October 19, 2009 (98 days after Mr. Karr sought EEO counseling and 43 days after he filed

19     his formal EEO complaint), the DRB issued its proposed discipline (a 45-day suspension and a

20     demotion). JSUF 12.

21  •  On July 6, 2010 (358 days after Mr. Karr sought EEO counseling and 303 days after he filed his

22     formal EEO complaint), Ms. James issued a decision sustaining the charges, agreeing that

23     demotion was warranted, and mitigating the suspension from 45 to 30 days.  JSUF 14.

24      Although the temporal proximity between the protected activities and the proposed and final

25  adverse employment actions might, in some cases, and when paired with an employer's knowledge of

26  the protected activities, support a prima facie case of retaliation,  Mr. Karr does not present evidence

27  that David Salazar, the DRB official who provided Mr. Karr's proposed discipline, knew about Mr.

28  Karr's protected activity.  In fact, Mr. Salazar testified at the MSPB hearing that he did not know that

1   Mr. Karr had a disability, made a request for reasonable accommodation, or had any EEO issues.  *See*

2   Second Reding Declaration, ECF No. 54-1, ¶ 2; Ex. A (MSPB1545-46 (Hearing Tran., Vol. II,

3   313:12-314:7).  And even though Ms. James knew when she made the final decision that Mr. Karr

4   had filed an EEO complaint, she testified that she did not consider this in her decision, JSUF 92, Mr.

5   Karr testified that he did not believe Ms. James, the deciding official related to his suspension and

6   demotion, retaliated against him, *see* Pl. Dep. 221:7-10 ("Q: Do you feel that [Ms. James] retaliated

7   against you on the basis of your alleged disability in making that decision? A: No."), and Ms. James

8   actually mitigated the DRB's proposed discipline, JSUF 12, 14, 94, 95.

9       On these facts, the court finds that Mr. Karr has not established that there was a causal link

10   between his protected activity and his suspension and demotion.  *See Barnett*, 228 F.3d at 1121.

11   Because this is a required element of his prima facie case, Defendant's motion for summary judgment

12   on Mr. Karr's retaliation claim is **GRANTED**.

13                                   **V.  CONCLUSION**

14       Based on the foregoing, Defendant's motion for summary is **GRANTED** in full.  Summary

15   judgment is entered in favor of Defendant with respect to Mr. Karr's discrimination and retaliation

16   claims (Claims One and Two).

17       This disposes of ECF No. 55.

18       **IT IS SO ORDERED.**

19   Dated: September 25, 2012

20                                   _____
                                     LAUREL BEELER
21                                   United States Magistrate Judge

22

23

24

25

26

27

28

C 11-02207 LB
ORDER